JONATHAN F. MITCHELL*
Texas Bar No. 24075463
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940

* admitted *pro hac vice*

BRADLEY BENBROOK
California Bar No. 177786
Benbrook Law Group, PC
400 Capitol Mall, Suite 2530
Sacramento, California 95814
(916) 447-4900

*Counsel for Plaintiffs and Proposed Classes*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| **Michael Martin**, **Lori Bonner**, **Philip David Glick**, and **Kimberly Jolie**, as individuals and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>**California Teachers Association**; **Riverside City Teachers Association**, as representative of the class of all chapters and affiliates of the California Teachers Association; | Case No. 2:18-cv-08999-JLS-DFM<br><br><br><br><br>**Plaintiffs' First Amended Class-Action Complaint** |

**National Education Association**; **Riverside Unified School District**, as representative of the class of all school districts in California; **Edmund G. Brown**, in his official capacity of Governor of the State of California; **Xavier Becerra**, in his official capacity as Attorney General of the State of California; **Eric Banks, Priscilla Winslow, Erich Shiners**, and **Arthur A. Krantz**, in their official capacities as chair and members of the California Public Employment Relations Board,

Defendants.

## INTRODUCTION

Michael Martin, Lori Bonner, Philip David Glick, and Kimberly Jolie ("the plaintiffs") bring this class action against the California Teachers Association (CTA), state officials, and others who have violated their constitutional and state-law rights. The plaintiffs are a former members of the CTA and its affiliates, and they sue on behalf of themselves and current and former union members whose rights have been violated by the CTA's illegal and unconstitutional activities.

First. The CTA has violated the plaintiffs' constitutional rights by forcing them to work in an "agency shop," where they must choose between retaining their union membership and paying full union dues, or resigning their membership and paying a slightly reduced amount in "fair share service fees." *See*

Cal. Gov't Code §§ 3546 and 3546.3 (attached as Exhibits 1 and 2). The plaintiffs chose to remain in the union until the Supreme Court's ruling in *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), even though they opposed the union and its political and collective-bargaining activities. Some of the plaintiffs remained in the union because they were never informed of their right to decline union membership and pay a reduced amount in "fair share service fees." Others were aware of this option but reluctantly stayed in the union because resigning their membership would have saved very little money and would not have been worth the cost of losing their vote and whatever little influence they might have had in collective-bargaining matters. The plaintiffs seek a refund of all money that they unwillingly paid to the unions as a condition of their employment, and they seek a classwide recovery on behalf of all current and former CTA members who were compelled to pay money to the union against their will and in violation of their constitutional rights.

Second. The CTA has illegally and unconstitutionally garnished the wages of its members by automatically enrolling them in a $20-per-year "voluntary contribution" program. The union does not seek or obtain the consent of an employee before deducting this $20 annual "contribution" from his paycheck. Instead, the union *automatically* enrolls each of its members in this payroll-deduction program, and then graciously offers them an opportunity to "opt out" if they complete and submit a form. *See* https://www.cta.org/en/About-CTA/Voluntary-Contribution.aspx (attached as Exhibit 3). The money that

the union takes from these "voluntary contributions" is used for political and ideological advocacy and awarded to union-supported scholarship programs. *Id.*

This so-called "voluntary contribution" program is an unlawful and unconstitutional pilfering of an employee's wages. If a private employer started deducting $20 from his employees' paychecks without obtaining their consent and directed that money to his favorite charities or political causes, he would be liable for wage theft — regardless of whether he provided an opportunity to "opt out" of his unilaterally imposed payroll deductions. The legality of this behavior is no different when committed by the CTA. The plaintiffs seek compensatory and punitive damages on behalf of every union member whose wages were garnished and redirected toward this "voluntary contribution" program without their clear and affirmative consent, or whose valuable time was diverted toward filling out and submitting the "opt-out" form that was needed to prevent the CTA from raiding their paycheck.

Third. The state of California has enacted numerous statutory provisions that violate the constitutional rights of public employees. Cal. Gov't Code § 3558, for example, compels school employers to disclose their employees' personal, private contact information to the union without seeking or obtaining the employee's consent. *See* Exhibit 6. The information that must be disclosed includes the employee's name, job title, department, work location, home address, work, home, and personal cell phone numbers, and personal e-

mail addresses. This statute unconstitutionally chills First Amendment free-doms by deterring school employees from criticizing or bucking the union. It also violates the rights of privacy protected by the federal and state Constitu-tions.

Fourth. Several provisions in the recently enacted Senate Bill 866 violate the constitutional rights of public employees by restricting their right to resign their union membership and cease providing financial support to union. Sec-tions 1, 2 and 10 of SB 866, for example, forbid public employees to cancel their union-related payroll deductions unless they submit their request to the union rather than school officials. These provisions are unconstitutional. A public school is bound by the Fourteenth Amendment to respect the constitu-tional rights of school employees—and school officials must immediately honor an employee's request to terminate his financial support of a public-em-ployee union without requiring the employee to funnel that request through union officials. Any school district that continues to take payroll deductions from an employee that has resigned his union membership is violating the Constitution—and nothing in SB 866 can absolve a school district of its con-stitutional responsibilities.

Fifth. The CTA and school officials are violating the constitutional rights of nonunion teachers by forbidding them to negotiate contracts that depart from the terms of a union-negotiated collective-bargaining agreement. Just as a teacher cannot be forced to join or financially support a union as a condition of employment, neither can a teacher be bound to the terms of employment

negotiated by a union that he refuses to join or support. Mr. Martin has been especially harmed by the anticompetitive terms of employment that the CTA and its affiliates have negotiated in collective-bargaining agreements throughout the State. Although Mr. Martin is a highly credentialed and distinguished STEM teacher with more than 34 years of experience, he cannot accept employment from other school districts unless he agrees to drastically reduce his salary, because the collective-bargaining agreements often prohibit schools from paying lateral hires in accordance with their previous teaching experience. In addition, the collective-bargaining agreements negotiated by the CTA require uniform salaries across subject matter—even though STEM teachers such as Mr. Martin have more lucrative opportunities in the private sector and therefore require higher salaries to retain them in the teaching profession. There is a widespread and well documented shortage of math and science teachers throughout the United States, and this has been exacerbated by collective-bargaining agreements that place STEM teachers on the same pay scale as elementary-education instructors. The Constitution protects Mr. Martin's right to negotiate his own terms of employment, and he cannot be held back by a public-employee union that refuses to look after his interests.

Sixth. The CTA's collective-bargaining agreements violate the antitrust laws by shielding incumbent teachers from competition and harming teachers who would command higher salaries without the union's involvement. The so-called labor exemption that the Supreme Court has read into the antitrust laws is derived from the federal labor statutes, which allow for collective bargaining

only in the *private* sector. *See* 29 U.S.C. § 152(2)–(3) (excluding public employers and public employees from the National Labor Relations Act); *Brown v. Pro Football Inc.*, 518 U.S. 231 (1996) ("The Court has implied this [labor] exemption from federal labor statutes, which set forth a national labor policy favoring free and *private* collective bargaining." (emphasis added)). There is no basis in any federal labor statute for exempting public-employee unions from the antitrust laws, as federal labor law is entirely agnostic on whether or to what extent public employees should be allowed to unionize. The court should enjoin the CTA, its affiliates, and all school districts in the State from making or enforcing collective-bargaining agreements that prevent nonunion teachers from negotiating their own salaries and terms of employment with public employers.

## JURISDICTION AND VENUE

1.  The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

2.  Venue is proper because at least one defendant resides or has its offices located in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

3.  Plaintiff Michael Martin resides in Riverside County, California.

4.  Plaintiff Lori Banner resides in Riverside County, California.

5.  Plaintiff Philip David Glick resides in Orange County, California.

6.  Plaintiff Kimberly Jolie resides in San Diego County, California.

7. Defendant California Teachers Association (CTA) is a labor union whose offices are located at 1705 Murchison Drive, Burlingame, California 94010.

8. Defendant Riverside City Teachers Association is a local union chapter affiliated with the CTA. Its offices are located at 3556 Central Avenue, Riverside, California 92506. It is sued as representative of the class of all chapters and affiliates of the CTA.

9. Defendant National Education Association (NEA) is a labor union whose headquarters are located at 1201 16th Street NW, Washington, D.C. The NEA is affiliated with the CTA.

10. Defendant Riverside Unified School District is a school district in Riverside County, California. Its offices are located at 3380 14th Street, Riverside, California 92501. It is sued as representative of the class of all public-school districts in California.

11. Defendant Edmund G. Brown is the governor of California. His office is in Sacramento, California. Governor Brown is the representative of the State and is sued in his official capacity.

12. Defendant Xavier Becerra is the Attorney General of California. His office is in Sacramento, California. Attorney General Becerra is the chief law officer of the State and is charged with enforcing the State's laws—including Cal. Gov't Code §§ 3546, 3546.3, and 3558 and Senate Bill 866, all of which the plaintiff is challenging as unconstitutional. Attorney General Becerra is sued in his official capacity.

13.  Defendants Eric Banks, Priscilla Winslow, Erich Shiners, and Arthur A. Krantz are members of the California Public Employment Relations Board, the entity that oversees public-sector collective bargaining in California and administers the State's labor and collective-bargaining laws, including Cal. Gov't Code §§ 3546, 3546.3, and 3558 and Senate Bill 866, all of which the plaintiff is challenging as unconstitutional. Their offices are located at 1031 18th Street, Sacramento, California 95811-4124. They are all sued in their official capacities.

## STATEMENT OF THE CLAIM

14.  The plaintiffs bring six separate claims against the CTA and the other defendants in this case.

### Claim #1: Unconstitutional Agency Shop

15.  Mr. Martin is a public-school teacher employed by the Riverside School District, and a former member of the California Teachers Association (CTA), the Riverside City Teachers Association, and the National Education Association (NEA).

16.  Ms. Bonner, Mr. Glick, and Ms. Jolie are public-school teachers and former members of the California Teachers Association (CTA), its affiliates, and the National Education Association (NEA).

17.  Before *Janus*, each of the plaintiffs worked in an "agency shop," where they were forced to either join the CTA and its affiliates and pay full membership dues, or else decline union membership and pay the union a slightly reduced amount in "fair share service fees."

18.  Each of the plaintiffs opposed the payment of fees to the CTA and its affiliates, because they disapprove of the union's political advocacy and do not wish to subsidize the union in any way. Nevertheless, each of the plaintiffs remained members of the union until the Supreme Court's ruling in *Janus*.

19.  Some of the plaintiffs remained in the union because they were never informed of their constitutional right to quit the union and pay a reduced amount in "fair share service fees," or they were led to believe that union membership was a mandatory condition of their employment. Other plaintiffs were aware of their option to decline union membership but chose to remain in the union because they would have been forced to continue paying "fair share service fees" had they resigned, and the difference in money between the full membership dues and the "fair share service fees" would not have been worth the loss of their vote and whatever little influence they might have been able to exert in collective-bargaining matters.

20.  Each of the plaintiffs resigned their union membership after the Supreme Court's ruling in *Janus*. *See, e.g.*, Exhibit 12.

21.  The compelled subsidy that the plaintiffs and their fellow class members were forced to pay to the CTA and its affiliates as a condition of their employment violated their constitutional rights.

22.  The law of California authorized the CTA and its affiliates to compel payments from non-union members as a condition of their employment. *See, e.g.,* Cal Gov't Code § 3546 (attached as Exhibit 1). The CTA and its affiliates

were therefore acting under color of state law by enforcing these unconstitutional agency-shop arrangements. *See Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922 (1982).

23. The Supreme Court's ruling in *Janus* is retroactive. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 96 (1993) ("[A] rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law.").

24. The CTA and its affiliates are liable under 42 U.S.C. § 1983 to the plaintiffs and all other current or former union members who would have resigned from the union had they not been compelled to work in an agency shop, and it owes refunds equal to the amount of the "fair share service fees" that it extracted from these employees regardless of whether they stayed in the union or resigned.

25. The plaintiffs are suing on behalf of all current and former members of the CTA who were compelled to subsidize the union or its affiliates against their will on account of these unconstitutional agency-shop arrangements. The class includes: (1) employees who joined the union because they were never informed of their constitutional right to decline union membership and pay a reduced amount in "fair share service fees"; and (2) employees who were fully informed of their right to decline union membership but who reluctantly joined the union because the difference between the cost of full membership dues and the mandatory "fair share service fees" would not have been worth the loss of their voice and vote in collective-bargaining matters. The

class includes anyone who has ever fallen within this definition, including for-mer and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

26.  The plaintiffs have Article III standing to bring these claims. They suf-fered injury in fact because they were forced to pay money to the union against their will as a condition of employment. The injury was caused by the uncon-stitutional behavior of the defendants, and the injury will be redressed by a refund of the money that the union unconstitutionally extracted from Mr. Martin and his fellow class members.

## Claim #2: Illegal Garnishment of Wages

27.  In addition to the union dues that the CTA and its affiliates collect, the CTA garnishes an additional $20 per year from its members and automat-ically deducts this money from their paychecks. *See* https://www.cta.org/en/About-CTA/Voluntary-Contribution.aspx (last visited on November 6, 2018) (attached as Exhibit 3). The CTA uses the money from these $20 assessments to fund its political and ideological advocacy, as well as designated grant pro-grams and scholarships. *Id.*

28. The CTA does not ask for or obtain permission before taking this money from an employee's paycheck. Instead, the CTA *automatically* enrolls its members in this payroll-deduction program, but permits them to "opt out" if they take time to complete and mail an opt-out form to the union's offices. *See   id.*;   *see   also*   https://www.cta.org/~/media/Documents/About/Leadership/Forms%20Center/Voluntary%20Contribution%20Change%20

Form%2017-18.ashx (last visited on November 6, 2018) (attached as Exhibit 4).

29.  To complete the opt-out form, an employee must download, print, and fill out the form by hand. The form as it currently appears on the Internet is not a fillable pdf. *See id.*

30.  Then the employee who wishes to opt-out must physically mail the completed form to the union and pay for the postage. There is no option to e-mail or fax the completed opt-out form to the CTA's offices, and there is no way to submit this form over the Internet.

31.  The CTA provides only a limited period of time for its members to opt-out of this annual $20-per-year assessment. According to CTA's website, "[t]he window to reallocate your contribution or opt out is August 1, 2017 to November 1, 2017." *See* Exhibit 3. And according to the opt-out form, the union must *receive* the completed opt-out form in its offices before November 1 or else the form "will not be accepted." *See* Exhibit 4. The union also assures those wishing to opt out that it is "not responsible for lost or redirected mail and illegible entries." *Id.*

32.  Near the bottom of the webpage that explains this "voluntary contri-bution" program, there is a line of small boldface text that reads "Manage your voluntary contribution online." But there is currently an image of a padlock next to this text and neither the text nor the image of the padlock provides a link to anything. *See* https://www.cta.org/en/About-CTA/Voluntary-Contribution.aspx (last visited on November 6, 2018) (attached as Exhibit 3).

33.  This web page has been captured seven previous times on the Way-back Machine: on June 24, 2017; April 1, 2016; April 14, 2014; February 8, 2014; August 30, 2013; April 4, 2013; and October 16, 2012. *See* Exhibit 5. None of the captured pages from August 30, 2013, through June 24, 2017, has a working link from "Manage your voluntary contribution online," and each of them has the same padlock appearing on the left side of this text. This includes the page that was captured August 30, 2013, which fell during the three-month "open-enrollment period" that spans from August through October.

34.  The CTA calls this a "voluntary contribution" program, apparently because it has preserved some semblance of an opt-out mechanism for those who: (a) *notice* that the CTA is taking or intends to take this money from their paychecks—in an era of direct deposit, many employees do not receive pay stubs and have little occasion to examine them; (b) *learn* that they have the opportunity to opt out of this annual $20 assessment; and (c) are *willing to spend* the time and money needed to fill out the form and mail it to the union.

35.  The CTA and its affiliates have committed the torts of conversion and trespass to chattels by garnishing these annual $20 "voluntary contributions" from the paychecks of school employees without securing clear and affirmative consent from each individual whose money is taken. The opt-out mechanism that the CTA provides does not make its conduct any less tortious. No private employer would be allowed to unilaterally deduct $20 from his employees' paychecks and then direct that money to his pet charities or political causes— even if the private employer offered an opt-out mechanism of the sort that the

CTA provides. The union's tortious conduct is aggravated by the fact that it has made the opt-out mechanism more onerous than needed by refusing to provide a fillable pdf opt-out form, by forbidding employees to opt out unless they do so during a three-month "open-enrollment period," and by limiting its members' ability to opt out over e-mail or by submitting a form through the Internet.

36. The CTA and the school districts have violated the First Amendment by redirecting these $20 "voluntary contributions" from the paychecks of school employees without first securing the employees' affirmative consent. Public employees must "clearly and affirmatively consent before any money is taken from them" by a public-employee union. *Janus*, 138 S. Ct. at 2486. The mere decision to *join* a union does not signify "clear and affirmative consent" to whatever future demands a union decides to impose on an employee's paycheck. And a union member, no less than a non-member, has the same constitutional right to be free from compelled association and must "clearly and affirmatively consent" to any monetary assessments or "voluntary contributions" that a union seeks to impose.

37. No provision of California law of which we are aware authorizes the CTA to help itself to the wages of its members in this fashion. The closest provision appears to be section 1152 of the California Government Code, which allows certain public-employee unions to request payroll deductions for "membership dues," "initiation fees," "general assessments" and "payment of any other membership benefit program sponsored by the organization." But

this $20 "voluntary contribution" program does not fall under any of these four categories. It is not a "membership fee" because it purports to be "voluntary." It is not an "initiation fee" because it is imposed on all union members rather than the newly initiated. It is not a "general assessment" because members are allowed to opt out—hence it is neither "general" nor an "assessment." And it is not a "membership benefit program" because the money does not fund "benefits" that are offered to the union's members. And in all events, section 1152 governs only the unions that represent employees of the state or the California State University, not the employees of public-school districts. *See* Cal. Gov't Code § 1150(c).

38.  Even if section 1152 (or some other provision of California law) could somehow be construed to authorize the CTA to garnish money from its members' paychecks in this fashion, the law would be unconstitutional. Any such law would violate the First Amendment because public employees must "clearly and affirmatively consent before any money is taken from them" by a public-employee union. *Janus*, 138 S. Ct. at 2486. The Due Process Clause also forbids a state or its subunits to deprive public employees of their "property" without due process of law, and a regime that authorizes the CTA to help itself to the wages of its members whenever it wants and without securing the employee's prior consent is about as far from "due process of law" as one can imagine. A law that allows the CTA to take money from its members' paychecks in this fashion would also violate the Equal Protection Clause. No

private employer would be allowed to unilaterally deduct $20 from his employees' paychecks and then direct that money to his preferred charities or lobbying organizations—even if the private employer offered an opt-out mechanism of the sort that the CTA provides. A regime that protects the paychecks of private employees from these unilateral payroll deductions but fails to confer equal protections on public employees is the quintessential denial of the "equal protection of the laws."

39. The CTA and its affiliates are liable to their members and former members for: (a) compensatory damages for each $20 annual assessment that it took from employees who did not clearly and affirmatively consent; (b) compensatory damages for the postage costs spent by those who opted out of the $20 annual assessment; (c) compensatory damages for the time that employees spent opting out of these annual assessments, including the time spent downloading, printing, filling out, and mailing the opt-out form; and (d) punitive damages.

40. The school districts that diverted these $20 "voluntary contributions" from the paychecks of their employees at the union's behest are jointly and severally liable.

41. The plaintiffs are suing on behalf of a class of all current and former CTA members who: (1) had these $20 "voluntary contributions" taken from their paycheck without their clear and affirmative consent; or (2) opted out of these so-called "voluntary contributions." The class includes everyone who has ever fallen within this definition, including former or retired teachers or

teachers who have moved to other States, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

42. The plaintiffs have Article III standing to bring these claims. They have suffered injury in fact because they were either subjected to unauthorized deductions from their paychecks, or else they were forced to divert their time and resources toward filling out the union's "opt out" form. The injury was caused by the illegal and unconstitutional behavior of the defendants, and it will be redressed by an award of damages.

### Claim #3: Challenge To Cal. Gov't Code § 3558

43. Section 3558 of the California Government Code requires school employers to disclose their employees' personal, private contact information to the union without seeking or obtaining the employee's consent. The information that must be disclosed includes the employee's name, job title, department, work location, home address, work, home and personal cell phone numbers, and personal e-mail addresses. *See* Exhibit 6.

44. California law does provide some accommodations for employees who do not want their personal information shared with the union. *See, e.g.*, Cal. Gov't Code § 6207 (protecting the privacy of victims of domestic violence, sexual assault, and stalking) (attached as Exhibit 7); Cal. Gov't Code § 6254.3 (a)(3) (protecting the home addresses and phone numbers of employees performing law-enforcement functions) (attached as Exhibit 8). California also allows any employee to opt out of providing his home address, home and

personal cell-phone numbers, and personal e-mail address to a public-employee union. *See* Cal. Gov't Code § 6254.3(c).

45.  Although these efforts to accommodate employees' privacy rights are commendable, they do not go far enough. The Court should require public employers to secure an employee's affirmative consent *before* releasing that employee's home address, home or personal cell-phone number, or personal e-mail address to a public-employee union—especially for employees who oppose the union and would fear retaliation from a union that has their personal contact information on file. *Janus* rejected an "opt-out" regime for the payment of agency fees and required "clear and affirmative consent" before money could be taken from a non-union member's paycheck. The same "clear and affirmative consent" should be required before a non-union member's personal contact information is divulged to a public-employee union that he does not belong to.

46.  The problem with California's "opt-out" regime is that it will inevitably cause unions to obtain the personal contact information of employees who do not want their personal information shared with the union. Many employees who oppose the union will not become aware of the compelled-disclosure requirement until after their personal information has already been disclosed—and at that point it is too late to unring the bell.

47.  And when the union has the home address, home phone number, personal cell-phone number, and personal e-mail address of an employee who is disinclined to join the union, it creates a chilling effect on First Amendment

freedoms. Labor unions—including public-employee unions—have a long and sordid history of bullying tactics that include criminal violence, and the mere knowledge that the union has one's home address, home and personal cell-phone numbers, and personal e-mail address can be enough to intimidate employees into staying on the union's good side and avoiding speech that criticizes the union or its activities.

48.  When Michigan enacted a right-to-work law in 2012, the International Union of Operating Engineers, Local 324, started publishing an "RTW Freeloaders List"—and they included this list on the back cover of their magazine that they mailed to union members. *See* Exhibit 9. This list posted the names of public employees who had exercised their constitutional right to quit the union and withdraw financial support from an entity that does not share their values. Section 3558 does not include any safeguards to protect non-union members from being bullied and intimidated in this manner—and it does not prohibit the union from creating blacklists or publicizing the home addresses, home phone numbers, personal cell-phone numbers, and personal e-mail addresses that it acquires under section 3558. Without a requirement of affirmative consent, section 3558's compelled-disclosure regime becomes an unconstitutional effort to deter public employees from exercising their constitutional right to quit the union and withdraw financial support.

49.  In 2012, a Wisconsin teacher named Kristi LaCroix appeared in a television ad and spoke in support of Governor Scott Walker during his recall

election. This triggered many vicious acts of retaliation that included threatening e-mails and phone messages—and someone went so far as to post Ms. LaCroix's home address and phone number on an Internet website. *See, e.g.*, Scott Walker, *Unintimidated: A Governor's Story and a Nation's Challenge* 159. (Penguin Publishing Group 2013); *Kenosha Teacher Receives Threats Over Walker Ad Involvement*, available at https://bit.ly/2NdMANT (last visited November 6, 2018) (attached as Exhibit 10). Section 3558 does not include any safeguards to prevent the misuse of employees' contact information once it is in the hands of the union—and employees who know that the union has their personal information will be chilled from speaking on behalf of politicians that the union opposes. Without an affirmative-consent requirement, section 3558 is an unconstitutional effort to deter public employees from exercising their constitutional right to speak in favor of any politician or policy position opposed by the union.

50. The union has ample means to communicate with the members of its bargaining unit without the need for home addresses, home phone numbers, personal cell-phone numbers, and personal e-mail addresses. The union can send mail to an employee's work address, and it can send e-mail to an employee's work e-mail account.

51. For these reasons, section 3558 cannot survive the "exacting scrutiny" that the Supreme Court applies to compelled-disclosure laws of this sort. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976).

52.  Section 3558 also violates the right to privacy protected by the federal and state Constitutions. *See Whalen v. Roe*, 429 U.S. 589 (1977); Cal. Const. art. I, § 1 ("All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.").

53.  Any public employer that discloses or that threatens to disclose an employee's home address, home phone number, personal cell-phone number, or personal e-mail address to a public-employee union without first securing the employee's clear and affirmative consent to this disclosure is liable in tort for an invasion of privacy. An employer cannot rely on section 3558 or section 6254.3(c) to shield itself from liability because those statutes violate the federal and state constitutions, and unconstitutional statutes cannot confer immunity on tortious conduct.

54.  Any public-employee union that seeks and acquires an employee's home address, home phone number, personal cell-phone number, or personal e-mail address from a public employer is liable in tort for an invasion of privacy if the employee did not clearly and affirmatively consent to this disclosure. A public-employee union cannot rely on section 3558 or section 6254.3(c) to shield itself from liability because those statutes violate the federal and state constitutions, and unconstitutional statutes cannot confer immunity on tortious conduct.

55.   The plaintiffs are suing on behalf of a class of all public employees who do not want their personal contact information disclosed to the union, and who must opt out under section 6254.3(c) to prevent this from happening.

56.   The plaintiffs have standing to challenge section 3558 because they are currently employed as public-school teachers and do not want the CTA or its affiliates to have their personal contact information. The statute inflicts injury in fact by requiring him to opt out in writing to prevent his employer from disclosing his personal contact information to the union. This injury will be redressed by an injunction that prevents public employers, public-employee unions, and state officials from enforcing section 3558 or section 6254.3(c) unless an employee affirmatively consents to the disclosure of his personal contact information.

## Claim #4: Challenge To Senate Bill 866

57.   Senate Bill 866 places numerous roadblocks in the path of public employees who have decided to resign their union membership and withdraw their financial support from a public-employee union. These provisions are unconstitutional because public employees have a constitutional right to resign their union membership and immediately terminate financial support of a union that they no longer support. *See Janus*, 138 S. Ct. 2448. Every public employer and every public-employee union must honor and implement the wishes of an employee who has withdrawn his "affirmative consent" to union fees or assessments—regardless of how a public employee chooses to communicate his instructions. *Id.* at 48.

58. Section 1 of SB 866 creates a new section 45060(e) of the California Education Code, which reads as follows: "Employee requests to cancel or change authorizations for payroll deductions for employee organizations shall be directed to the employee organization rather than to the governing board." *See* Exhibit 11. Section 2 of SB 866 creates a similar provision in section 45168(a)(6) of the California Education Code, which states: "Employee requests to cancel or change authorizations for payroll deductions for employee organizations shall be directed to the employee organization rather than to the governing board." *See* Exhibit 11. And section 10 of SB 866 creates a similar provision in section 1157.12(b) of the California Government Code, which requires public employers other than the state to "[d]irect employee requests to cancel or change deductions for employee organizations to the employee organization, rather than to the public employers." *See* Exhibit 11.

59. These provisions are unconstitutional, because a public employer must immediately cease union-related payroll deductions upon learning that an employee has withdrawn his "affirmative consent" to those assessments— regardless of whether the employee funnels his request through the union or submits his request directly to the public employer. *See Janus*, No. 16-1466, slip op. at 48.

60. Mr. Martin, upon resigning his union membership, sent an e-mail on July 6, 2018, to Gina Scott, a credential analyst at the Riverside Unified School District, which said: "I have resigned my union membership, and I am asking

that the Riverside Unified School District cease all union-related payroll deductions that I had previously authorized." *See* Exhibit 13. The school district is constitutionally obligated to honor Mr. Martin's request, as he has clearly and unequivocally revoked his "affirmative consent" to payroll deductions. *See Janus*, No. 16-1466, slip op. at 48.

61.  Yet section 45060(e) instructs the school district to *continue* diverting Mr. Martin's paycheck toward the union—in violation of *Janus* and in violation of Mr. Martin's First Amendment rights—because Mr. Martin chose to submit his e-mail directly to school officials rather than asking the union to take care of matters. Statutes cannot instruct school officials to violate an employee's constitutional rights, and the Court should enjoin the defendants from enforcing the second sentence of section 45606(e).

62.  Sections 45060(a) and (c) of the California Education Code also require school employees to revoke their consent to payroll deductions "in writing." See Exhibit 11. *See also* Cal. Educ. Code § 45168(a)(1) (requiring classified school employees to revoke their prior consent to payroll deductions "in writing"); Cal. Educ. Code §§ 87833(a), 87833(c), 88167(a)(1) (requiring community-college employees to revoke their prior consent to payroll deductions "in writing"). It is not clear whether these statutory provisions allow employees to revoke their consent to payroll deductions over e-mail, as Mr. Martin did. *See* Exhibit 13. Mr. Martin seeks a declaratory judgment that his e-mail of July 6, 2018, that was sent to Gina Scott satisfies section 45060's requirement that his revocation take place "in writing." If it does not, then sections

45060(a) and (c) are unconstitutional because they require public employers to continue taking union assessments from the paychecks of public employees who have clearly and unequivocally communicated that they no longer "affirmatively consent" to these assessments.

63.  Mr. Martin is suing on behalf of a class of all public employees in California who resigned their union membership after the enactment of Senate Bill 866. The class includes anyone who comes within this definition before the conclusion of this action.

64.  Mr. Martin has Article III standing to bring these claims. He has suffered injury in fact because SB 866's amendments to the California Education Code forbid school officials to implement his instructions to cease union-related payroll deductions because he e-mailed that request directly to his employer rather than going through the union. The injury is caused by SB 866, and it will be redressed by an injunction that forbids the defendants to enforce the offending provisions of SB 866.

### Claim #6: Constitutional Right To Negotiate Outside The Collective-Bargaining Agreement

65.  Even though Mr. Martin has resigned his union membership, the law of California and the CTA's collective-bargaining agreements continue to prevent Mr. Martin from negotiating his own terms of employment. He remains bound to the terms of employment negotiated by a union that he does not belong to and wants nothing to do with—and he *must* accept this union as his exclusive representative whether he likes it or not. The state and the union

have also forbidden Mr. Martin to negotiate his own terms of employment with other public schools throughout the State. A regime that compels non-union teachers to accept the representation of a public-employee union that they oppose violates the First Amendment.

66.  Although the Supreme Court has never gone so far as to hold that the Speech Clause requires public employers to permit non-union employees to negotiate outside the union, the *Janus* opinion repeatedly acknowledges that exclusive union bargaining abridges the associational freedom of individual employees. *See Janus*, 138 S. Ct. at 2460 ("Designating a union as the employees' exclusive representative substantially restricts the rights of individual employees."); *id.* at 2478 ("It is also not disputed [in *Janus*] that the State may require that a union serve as exclusive bargaining agent for its employees— itself a significant impingement on associational freedoms that would not be tolerated in other contexts."). *Janus* also recognizes that collective bargaining in public education requires the union to stake out positions on controversial political issues—including merit pay for teachers, the role of seniority and tenure, how teachers should be evaluated, and political issues such as climate change and LGBT rights. *See id.* at 2474–77. So it is inevitable that individual employees will disapprove of the bargaining positions adopted by the exclusive representative, even when the representative is legally required to act on their behalf. Forcing a non-union teacher to accept the representation of an un-

wanted union—and forcing that non-union teacher to accept the union-nego-tiated terms of employment—violates the freedom of association protected by the First Amendment.

67.  It is also wrong to assume that collective bargaining confers offsetting benefits on dissident teachers by increasing their salaries beyond what they would earn in a non-union teaching market. Collective-bargaining agreements force teachers into a union-imposed salary structure that benefits some teach-ers at the expense of others. One of the most perverse features of teacher col-lective bargaining is the insistence on a single salary schedule for teachers re-gardless of subject matter. There is a well-documented nationwide shortage of teachers in science, technology, engineering, and mathematics (STEM). *See, e.g.*, Dan Goldhaber, John Krieg, Roddy Theobald, and Nate Brown, *Refueling the STEM and Special Education Teacher Pipelines*, Phi Beta Kappan at 56–62 (December 2015 – January 2016) (attached as Exhibit 14). And the reason for this shortage is that college graduates with degrees in STEM fields have more lucrative opportunities in the private sector than those who graduate with de-grees in fields such as elementary education. Schools must therefore pay higher salaries to STEM teachers to induce them to accept jobs in the teaching profession—just as universities must pay higher salaries to law professors and business-school professors. But collective bargaining requires teachers to be paid the same across subject matter, which benefits elementary-education in-structors at the expense of STEM teachers such as Mr. Martin.

68. Collective bargaining also empowers the union to impose a salary structure that benefits long-tenured incumbent teachers—who often hold leadership positions in the local union and wield the most power and influence over collective-bargaining matters—at the expense of entry-level teachers and lateral hires. Collective-bargaining agreements require school districts to pay exceedingly low salaries to entry-level teachers—no matter how talented and no matter how impressive their academic backgrounds or previous careers may have been. This deters talented and capable individuals from entering the teaching profession and shields incumbent teachers from competition. And the future entry-level teachers that the union is supposedly "representing" are not even members of the bargaining unit at the time these agreements are made—so they have no vote and no say in the terms of employment that the union negotiates for them.

69. The CTA's collective-bargaining agreements also forbid school districts to hire veteran teachers from other schools unless that newly hired teacher agrees to give up most of the seniority that he had earned in his previous teaching job. This prevents experienced teachers such as Mr. Martin from accepting jobs in other school districts unless they accept a significant pay cut. In 2008, for example, Mr. Martin was recruited by the Upland Unified School District to teach a nationwide STEM curriculum called Project Lead the Way. At that time, Mr. Martin had accumulated 25 years of experience as a STEM teacher in the California public schools. But the Upland school officials told

Mr. Martin that their collective-bargaining agreement with the Upland Teachers Association prohibited them from paying Mr. Martin the salary of a teacher with 25 years of experience—even though Mr. Martin *had* 25 years of experience at that time. Instead, the Upland school district could give Mr. Martin (and any other lateral hire) a maximum of 10 years seniority, which would have placed him on the salary scale of an 11th-year teacher. This would have compelled Mr. Martin to take a substantial pay cut had he taken the job.

70.  The Upland Unified School District wanted to hire Mr. Martin at a salary commensurate with his years of experience, and Mr. Martin would have accepted a job with Upland had they not been forbidden by their collective-bargaining agreement to offer an appropriate salary. But Mr. Martin could not afford the pay cut that the Upland collective-bargaining agreement would have required him to take.

71.  It is common for CTA affiliates to insist on collective-bargaining provisions that limit the amount of credit a newly hired teacher can receive for past teaching experience. *See* John Fensterwald, *Some Districts Step Up Competition For Neighbors' Veteran Teachers* ( July 25, 2016), *available at* https://bit.ly/2atyq9V (last visited November 6, 2018) (attached as Exhibit 15) ("[T]eachers have been discouraged from transferring by a standard clause in most districts' contracts that capped the number of years that a teacher would be credited as having worked for the purpose of determining their new pay. The cap had the practical impact of locking in employment of mid-career and older teachers."). The collective-bargaining agreement between the Riverside

Unified School District and the Riverside City Teachers Association, for example, allows newly hired teachers to receive credit for no more than *five* years of previous teaching experience. *See* Exhibit 16, at page 22 ("New employees who have been employed in positions requiring certification in other school districts prior to employment in Riverside Unified are entitled to one (1) step on the salary schedule for every full year of such outside experience. The maximum allowance is five (5) steps for five (5) or more years of such prior experience."). A recently expired collective-bargaining agreement in the Upland Unified School District permits newly hired teachers to receive credit for no more than nine years of previous teaching experience. *See* Exhibit 17, at page 66.

72.  There is no rational reason for a collective-bargaining agreement to deny a teacher the seniority that he has accumulated at other school districts— other than an anti-competitive desire to maximize salaries for incumbent teachers at the expense of new entrants. Worse, Mr. Martin was not even part of the bargaining unit at the Upland Unified School District at the time this agreement was made. The local union at Upland had no duty to represent Mr. Martin or look out for the interests of teachers who would seek *future* jobs with the school district. The union's duty was to represent the *current* members of their bargaining unit—and they negotiated a deal that benefitted incumbent teachers while harming new entrants. The First Amendment forbids Mr. Mar-

tin to be bound by the terms of collective-bargaining agreements that are ne-
gotiated by local unions that he does not belong to—and that have no legal
duty to represent him or look after his interests.

73.  Mr. Martin is suing on behalf of a class of all public-school teachers in
California who do not belong to a union and want to negotiate their own terms
of employment outside the union's collective-bargaining agreements. The
class includes anyone who comes within this definition before the conclusion
of this action.

74.  Mr. Martin has Article III standing to bring these claims. He has suf-
fered injury in fact because the collective-bargaining agreements negotiated by
the CTA and its affiliates have made it impossible for him to obtain jobs in
other school districts without forfeiting his seniority and agreeing to a large
pay cut. These injuries were caused by the anti-competitive behavior of the
CTA and its affiliates, and it will be redressed by an injunction that permits
Mr. Martin and his fellow class members to negotiate their own terms of em-
ployment with school districts outside the collective-bargaining agreement.

## Claim #7: Antitrust Violations

75.  The CTA's collective-bargaining agreements also violate the antitrust
laws. The provisions in collective-bargaining agreements that command uni-
form salaries for teachers regardless of subject matter are anti-competitive,
and they cannot survive the rule of reason or any other standard of review.
They have also exacerbated the nationwide shortage of STEM teachers by

compelling them to accept salaries equal to those of elementary-education in-structors.

76.  The CTA and its affiliates have also violated the antitrust laws by com-pelling entry-level teachers to accept exceedingly low salaries negotiated by a bargaining unit that they do not belong to—and by forbidding entry-level teachers to negotiate better deals with the school district. This pernicious and anti-competitive feature of collective bargaining has deterred talented individ-uals from entering the teaching profession. It has also contributed to the na-tionwide shortage of STEM teachers by forbidding school districts to offer more attractive compensation packages that could entice math and science professionals away from the private sector.

77.  The CTA and its affiliates have violated the antitrust laws by negotiat-ing agreements that compel veteran teachers to forfeit years of seniority when they change jobs. This anti-competitive provision is yet another symptom of a union that seeks to maximize salaries for incumbent teachers and protect them from new entrants who would command high salaries at their expense. It has harmed upwardly mobile teachers and highly sought-after STEM teachers such as Mr. Martin. And it has harmed school districts and their students by imposing arbitrary roadblocks to the hiring of needed teachers.

78.  The so-called labor exemption that the Supreme Court has read into the antitrust laws protects only the collective-bargaining activities of private-sector unions, not public-employee unions such as the CTA. The Supreme Court has made clear that the labor exemption is derived from the federal labor

statutes, which protect collective bargaining only when it occurs in the private sector. *See* 29 U.S.C. § 152(2)–(3) (excluding public employers and public employees from the National Labor Relations Act); *Brown v. Pro Football Inc.*, 518 U.S. 231 (1996) ("The Court has implied this [labor] exemption from federal labor statutes, which set forth a national labor policy favoring free *and private* collective bargaining.") (emphasis added). There is no basis in any federal labor statute for exempting public-employee unions from the antitrust laws, as federal labor law is entirely agnostic on whether or to what extent public employees should be allowed to unionize.

79.  Even if public-employee unions could assert immunity from the antitrust laws in other contexts, there is no reason to interpret the antitrust laws in a manner that exempts collective bargaining for public-school teachers. The teaching profession is especially ill-suited for collective bargaining because there are vast differences among individual teachers in ability, skills, work ethic, subject-matter expertise, educational backgrounds, and job opportunities. This aggravates the anti-competitive harms that arise when collective-bargaining agreements compensate teachers according to union-imposed pay scales rather than the laws of supply and demand.

80. Mr. Martin is suing on behalf of a class of all teachers in California who have been harmed by the anti-competitive provisions in CTA-negotiated collective-bargaining agreements. This class includes: (1) STEM teachers, special-education instructors, and other teachers in high-demand fields whose salaries have been pulled down by the CTA's insistence on a uniform pay scale

across subject matter; (2) Entry-level teachers whose salaries have been pulled down by CTA-negotiated pay scales that benefit incumbent teachers at the expense of new entrants; (3) Any teacher who was denied year-to-year credit for previous teaching experience because of provisions in a CTA-negotiated collective-bargaining agreement; (4) Any teacher who wanted to change jobs but could not do so because a CTA-negotiated collective-bargaining agreement would have required him to forfeit seniority or would have denied him full credit for previous teaching experience.

81.  Mr. Martin has Article III standing to bring these claims. He has suffered injury in fact because the collective-bargaining agreements negotiated by the CTA and its affiliates have made it impossible for him to seek jobs in other school districts without forfeiting his seniority and agreeing to a large pay cut. These injuries were caused by the anti-competitive behavior of the CTA and its affiliates, and it will be redressed by treble damages and an injunction that permits Mr. Martin and his fellow class members to negotiate their own terms of employment without regard to union-negotiated agreements.

## CAUSES OF ACTION

82.  The plaintiffs are suing all of the defendants under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, each of which supplies a cause of action for the individual and class-wide relief that they are requesting.

83.  The plaintiffs are also suing the CTA, its chapters and affiliates, and the school districts under the federal antitrust laws, as well as the state-law

actions of conversion, trespass to chattels, replevin, unjust enrichment, resti-
tution, and any other legal or equitable cause of action that offers relief for this
unlawful seizure of his personal property. The plaintiffs invoke the supple-
mental jurisdiction of this court over those state-law claims. *See* 28 U.S.C.
§ 1367.

### Demand for Relief—Claim #1

84. The plaintiffs respectfully request that the court:

a.      certify a class of all current and former members of the CTA who
were compelled to subsidize the union or its affiliates against their
will on account of these unconstitutional agency-shop arrange-
ments;

b.      declare section 3546 of the California Government Code uncon-
stitutional because it allows public-employee unions to compel
payments from employees as a condition of their employment,
and permanently enjoin the defendants, and all of their officers,
agents, servants, employees, attorneys, and any other person or
entity in active concert or participation with them, from enforc-
ing section 3546 or any other provision of state law that author-
izes or enforces public-employee agency shops;

c.      declare that all provisions in collective-bargaining agreements
that compel the representative plaintiffs and their fellow class
members to pay "agency fees" or "fair share service fees" to the

CTA or its affiliates as a condition of their employment are un-constitutional;

d.  order the CTA and its affiliates, including the NEA, to refund to every class member an amount equal to the "fair share service fees" that the class members were forced to pay regardless of whether they retained or resigned their union membership;

e.  permanently enjoin the CTA and its affiliates, along with their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from taking or redirecting any type of money from any public em-ployee as a condition of their employment and without first ob-taining the employee's affirmative, written, and freely given con-sent;

f.  permanently enjoin all of the defendants, along with their offic-ers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from en-forcing any provision of California law, or any provision of a col-lective-bargaining agreement, that requires any payment of money as a consequence for exercising one's constitutional right not to join or financially support a public-employee union;

g.  award costs and attorneys' fees under 42 U.S.C. § 1988;

h.  grant all other relief that the Court may deem just, proper, or eq-uitable.

## Demand for Relief—Claim #2

85.   The plaintiffs respectfully request that the court:

a.      certify a class of all current and former CTA members who: (1) had annual $20 "voluntary contributions" taken from their paychecks by the CTA without their clear and affirmative consent; or (2) opted out of these "voluntary contributions."

b.      declare that the CTA, its affiliates, and the school districts have violated the First Amendment by taking these $20 annual assessments from the paychecks of school employees without first securing the employee's clear and affirmative consent;

c.      declare that the CTA, its affiliates, and the school districts have committed the torts of conversion and trespass to chattels by taking and threatening to take these $20 annual assessments from the paychecks of school employees without first securing the employee's clear and affirmative consent;

d.      order the CTA and its affiliates to pay compensatory and punitive damages to the class members, along with costs and attorneys' fees;

e.      hold the school districts jointly and severally liable for diverting these $20 "voluntary contributions" from their employees' paychecks without first securing the employee's clear and affirmative consent;

f.     permanently enjoin the CTA, its affiliates, and the school dis-
       tricts from garnishing or deducting these $20 annual assessments
       from the paychecks of school employees without first securing
       that employee's clear and affirmative consent in writing;

g.     permanently enjoin the CTA, its affiliates, and the school dis-
       tricts from garnishing or deducting any union-related payments
       from the paychecks of school employees without first securing
       that employee's clear and affirmative consent in writing;

h.     award costs and attorneys' fees under 42 U.S.C. § 1988;

i.     grant all other relief that the Court may deem just, proper, or eq-
       uitable.

### Demand for Relief—Claim #3

86.  The plaintiffs respectfully request that the Court:

a.     certify a class of all public employees who do not want their home
       addresses, home phone numbers, personal cell-phone numbers,
       or personal e-mail addresses disclosed to the union, and who
       must opt out under section 6254.3(c) of the California Govern-
       ment Code to prevent this from happening.

b.     declare that the plaintiffs and their fellow class members have a
       federal and state constitutional right to withhold their home ad-
       dresses, home phone numbers, personal cell-phone numbers, and
       personal e-mail addresses from a public-employee union, and de-

clare section 3558 of the California Government Code unconsti-

tutional to the extent it requires public employers to disclose this

information without first obtaining the employee's clear and af-

firmative consent;

c.      permanently enjoin the defendants, and all of their officers,

agents, servants, employees, attorneys, and any other person or

entity in active concert or participation with them, from enforc-

ing section 3558 of the California Government Code as applied to

the home addresses, home phone numbers, personal cell-phone

numbers, and personal e-mail addresses of employees who have

not clearly and affirmatively consented to the disclosure of this

information;

d.      permanently enjoin the Riverside Unified School District, along

with every school district in the State, from disclosing its employ-

ees' home addresses, home phone numbers, personal cell-phone

numbers, or personal e-mail addresses to a public-employee un-

ion without first securing the employee's clear and affirmative

consent;

e.      permanently enjoin the CTA and its affiliates and chapters, along

with their officers, agents, servants, employees, attorneys, and

any other person or entity in active concert or participation with

them, from seeking or obtaining the home addresses, home

phone numbers, personal cell-phone numbers, or personal e-mail

addresses of any employee who has chosen not to join or financially support the union, or any employee who has not affirmatively consented to this disclosure of his personal contact information;

f.  order the CTA and its affiliates to pay compensatory damages to any public employee whose privacy was invaded because of the union's efforts to acquire their home addresses, home phone numbers, personal cell-phone numbers, or personal e-mail addresses without first securing the employee's clear and affirmative consent;

g.  award costs and attorneys' fees under 42 U.S.C. § 1988;

h.  grant all other relief that the Court deems just, proper, or equitable.

### Demand for Relief—Claim #4

87. Mr. Martin respectfully requests that the court:

a.  certify a class of all public employees in California who resigned their union membership after the enactment of Senate Bill 866;

b.  declare that sections 45060(a), 45060(c), 45168(a)(1), 87833(a), 87833(c), and 88167(a)(1) of the California Education Code, which require public employees to revoke their prior consent to union-related payroll deductions "in writing," are satisfied if an employee sends an e-mail to his employer that says the employee is revoking his previous consent to these payroll deductions;

c.      declare the second sentence of section 45060(e) of the California Education Code unconstitutional because it compels public employers to continue diverting the paychecks of non-union members to a public-employee union — even after the employee has resigned his membership and clearly withdrawn his "clear and affirmative consent" to payroll deductions;

d.      declare the second sentence of 45168(a)(6) of the California Education Code, along with the first sentence of section 1157.12(b) of the California Government Code, unconstitutional for the same reason;

e.      permanently enjoin the defendants, along with their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from enforcing the second sentence of section 45060(e) of the California Education Code, the second sentence of 45168(a)(6) of the California Education Code, and the first sentence of section 1157.12(b) of the California Government Code;

f.      order the CTA and its affiliates to immediately cease collecting payroll deductions from employees who have resigned their union membership, and order the CTA and its affiliates to refund any payroll deductions that they continued to collect from former union members after their resignation date, notwithstanding any provision of state law, or any provision of a collective-bargaining

agreement, or any provision of a signed authorization for payroll deductions;

h.    award costs and attorneys' fees under 42 U.S.C. § 1988;

i.    grant all other relief that the Court deems just, proper, or equitable.

### DEMAND FOR RELIEF—CLAIM #6

88. Mr. Martin respectfully requests that the court:

a.    certify a class of all non-union teachers in California who want to negotiate their own terms of employment outside the union;

b.    declare that Mr. Martin and his fellow class members have a constitutional right to reject the CTA's representation and negotiate their own salaries and terms of employment with public school districts;

c.    declare unconstitutional any state law that prohibits Mr. Martin or his fellow class members from rejecting the CTA's representation and negotiating their own salaries and terms of employment with public-school employers, and permanently enjoin the defendants, along with their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from enforcing those unconstitutional state laws;

d.    declare unconstitutional any provision in any collective-bargaining agreement that prohibits school districts from negotiating

outside the union with non-union employees or non-union job applicants, and permanently enjoin the defendants, along with their officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with them, from enforcing or complying with any such provision in a collective-bargaining agreement;

e.   award costs and attorneys' fees under 42 U.S.C. § 1988;

f.   grant all other relief that the Court deems just, proper, or equitable.

### DEMAND FOR RELIEF—CLAIM #6

89. Mr. Martin respectfully requests that the court:

a.   certify a class of all teachers in California who have been harmed by the anti-competitive provisions in the collective-bargaining agreements negotiated by the CTA or its affiliates, or certify subclasses within this class if appropriate.

b.   order the CTA and its affiliates to pay treble damages to STEM teachers, special-education instructors, and other teachers in high-demand fields whose salaries have been pulled down by the union's insistence on a uniform pay scale across subject matter;

c.   order the CTA and its affiliates to pay treble damages to entry-level teachers whose salaries were pulled down by union-negotiated pay scales that benefit incumbent teachers at the expense of new entrants;

d.      order the CTA and its affiliates to pay treble damages to every teacher in California who had to forfeit seniority as a consequence of accepting a new job at a different school district because of provisions in a union-negotiated collective-bargaining agreement;

e.      order the CTA and its affiliates to pay treble damages to every teacher in California who wanted to change jobs but could not do so because a union-negotiated collective-bargaining agreement would have required them to forfeit their seniority and take a substantial pay cut;

f.      award costs and attorneys' fees;

g.      grant all other relief that the Court deems just, proper, or equitable.

Respectfully submitted.

 /s/ Jonathan F. Mitchell

Bradley Benbrook                      Jonathan F. Mitchell*
California Bar No. 177786              Texas Bar No. 24075463
Benbrook Law Group, PC                Mitchell Law PLLC
400 Capitol Mall, Suite 2530          106 East Sixth Street, Suite 900
Sacramento, California 95814          Austin, Texas 78701
(916) 447-4900 (phone)                (512) 686-3940 (phone)
(916) 447-4904 (fax)                  (512) 686-3941 (fax)
brad@benbrooklawgroup.com             jonathan@mitchell.law

                                      * admitted *pro hac vice*

                                      *Counsel for Plaintiffs and
Dated: November 6, 2018                the Proposed Classes*

## CERTIFICATE OF SERVICE

I certify that on November 6, 2018, I served this document through CM/ECF upon:

Scott A. Kronland
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
(415) 421-7151
skronland@altshulerberzon.com

*Counsel for the Union Defendants*

Nelson Ryan Richards
California Attorney General's Office
2550 Mariposa Mall, Room 5090
Fresno, California 93721
(559) 705-2324
nelson.richards@doj.ca.gov

*Counsel for the State Defendants*

        /s/ Jonathan F. Mitchell
        Jonathan F. Mitchell
        *Counsel for Plaintiffs and the Proposed Classes*